UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO. |
| | ) | 2:25-cr-15 |
| v. | ) | |
| | ) | |
| TERESA YOUNGBLUT, | ) | |
| Defendant. | ) | |

DISCOVERY CONFERENCE
Tuesday, June 24, 2025
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    Chief District Judge

APPEARANCES:

MATTHEW J. LASHER, AUSA, U.S. Attorney's Office, 11 Elmwood
    Avenue, 3rd Floor, P. O. Box 570, Burlington, VT
    05402-0570, Counsel for the Government

DENNIS E. ROBINSON, ESQ., and LISA M. THELWELL, ESQ., U.S.
    Department of Justice, Criminal Division, Violent Crime
    and Racketeering Section, 1301 New York Avenue, N.W.,
    Washington, D.C. 20005, Counsel for Government

STEVEN L. BARTH, AFPD, Office of the Federal Public Defender,
    95 Pine Street, Suite 150, Burlington, VT 05401, Counsel
    for the Defendant

JULIE L.B. STELZIG, AFPD, Office of the Federal Public
    Defender, 6411 Ivy Lane, Suite 710, Greenbelt, MD 20770,
    Counsel for the Defendant

TERESA YOUNGBLUT, DEFENDANT

Johanna Massé, RMR, CRR
Official Court Reporter
802-951-8102 | 802transcripts@gmail.com

1  Tuesday, June 24, 2025

2       (The following was held in open court at 1:08 PM.)

3            COURTROOM DEPUTY:  Your Honor, this is criminal case

4  number 25-15-1, the United States of America v. Teresa

5  Youngblut.  Representing the Government is Assistant United

6  States Attorney Matthew Lasher.  Also present are Attorneys

7  Dennis Robinson and Lisa Thelwell.  The defendant is

8  represented by her attorneys, Steven Barth and Attorney Julie

9  Stelzig.

10      The matter before the Court is a discovery conference.

11           THE COURT:  Good afternoon.

12           COUNSEL:  Good afternoon, Your Honor.

13           THE COURT:  I want to say something first about

14  sealing.  I did not see anything that was filed that needed to

15  be completely sealed.  So as you know, the applicable law is

16  that it needs to be narrowly tailored, it has to be for a

17  legitimate purpose, the Court needs to weigh the right to

18  public access.  So I want you to look at your filings, see what

19  you need to redact, and I want you to file them unsealed.  And

20  a sealing order itself should not be sealed.  So that's going

21  to be the way it is going forward, and we might as well start

22  with it now.  There are things that are properly redacted, but

23  discovery protocols and legal arguments don't fall among them.

24      I'm going to -- I've read your filings.  I'm going to give

25  you some of my preliminary thoughts.  I call them musings.  You

1  should not feel like they're rulings.  You should feel free to

2  push back on them, redirect me.

3      I can see this both ways, but one of the options, as the

4  Government pointed out, is to have the Court do the review

5  process or to have the Court designate another judge or

6  somebody to do the review as a special master.  I will not be

7  the fact finder in this case except for suppression motions,

8  and what I'm seeing in terms of the body of phone calls that

9  we're talking about and material, I can't imagine that it's

10 going to be so significant that I can't do it.  So I've done it

11 in many other cases.  I'm happy enough to do it in yours.

12     I'm uncomfortable with the Government having a filter team

13 not because I haven't used them in the past and because it

14 happens generally without any problems, but the defendant made

15 a good point about it's -- it's not just me trusting the AUSAs

16 and knowing that they obey the Constitution but the public

17 appearance of finding out that, wait a minute, you mean a

18 prosecutor's team is going to be looking at this first and then

19 delivering them to the defendant?

20     Same concern on the other side.  The defendant kind of

21 screening their own communications and making determinations

22 puts them in an awkward spot.  There's really not much of a

23 check on how that happens.

24     So I at this point don't see why the Court can't do that,

25 and you were planning on *in camera* inspections if there was a

1  dispute anyway.  I have done this and created my own privilege

2  log for you to review, so I -- I think it can be done, but I

3  want to hear from each of you further about why that won't be

4  workable, who you think -- if the Court designates another

5  judge, could it be our bankruptcy judge?  Does it need to be

6  somebody who has any kind of familiarity with the case?

7  *Et cetera*, *et cetera*.

8       So let's start with the Government.  And please announce

9  yourself for our court reporter.  She doesn't know all of you

10 yet.

11       MR. ROBINSON:  Thank you, Your Honor.  Dennis Robinson

12 representing the United States.

13       Your Honor, may I please argue from the podium?

14       THE COURT:  You can argue from wherever you're most

15 comfortable.

16       MR. ROBINSON:  Thank you.

17       Thank you, Your Honor.  May it please the Court?

18       Your Honor, the Government largely agrees with your

19 proposal.  We think it's fair.  We think it's rooted in law.

20 There's precedent establishing it.  I am disinclined to argue

21 in favor of the Government's proposal based on what you just

22 suggested but more inclined to argue against the defense's

23 proposal that the defense get first crack at these

24 communications.

25       Part of the problem we foresee with the defense's position

1  is that there's really no established mechanism not only from a

2  logistics perspective in terms of how the facilities might get

3  the material to the defense but there's really no --

4      THE COURT:  Well, so walk it through.  They collect

5  the calls, and why can't they send it to the defendant just as

6  easily as they can send it to the Government?

7      MR. ROBINSON:  That's an excellent point, Your Honor.

8  When I suggest "mechanism," I'm thinking more procedural and

9  legal mechanisms.  I'm thinking about the fact that

10  traditionally the Government will acquire these communications

11  by way possibly of a grand jury subpoena, possibly by way of an

12  administrative subpoena, and because that process has been

13  concretized over a significant portion of time in the history

14  of the United States legal system, facilities are habituated to

15  turning materials over in that way.

16      Now, they very well could.  I'm sure they could establish

17  some sort of system that gets those communications to the

18  defense.  However, our real problem is once they're there,

19  who's making the call on what is privileged and what is not?

20      Now, I want to be clear, the United States absolutely

21  respects the importance of protecting privileged and

22  confidential communications, and in no way are we questioning

23  that -- the defense in terms of their veracity in turning

24  things over to the Government, but I will note that the

25  defense -- the team is comprised of zealous advocates who want

1  to --

2            THE COURT:  As it should be.

3            MR. ROBINSON:  Correct.  They aggressively want to

4  protect their client's interest, and in the same way where if

5  the Government were to possess these records we would have a

6  certain interest in continuing our investigation, the defense

7  would have equally important interest in terms of protecting

8  their client.  But, Your Honor, the system that you proposed,

9  the special master, I think solves both problems, and we would

10 support that.

11      You know, the only other point I would argue about the

12 defense's position that I think cuts against a lot of their

13 arguments, there's a heavy reliance on *U.S. v. Gendron* out of

14 the Western District of New York.  Our concern is that the

15 defense frames *Gendron* as somewhat leading or at least heavily

16 persuasive in this circuit.  We'd argue *Gendron* is an anomaly.

17 It's not really a decision that reflects not only long-standing

18 practice but other cases in this circuit.

19      We relied heavily on *Avenatti* to show that there's

20 long-standing practice in this circuit for filter teams,

21 long-standing practice against letting the defense have first

22 crack at this, but more so, Your Honor, we feel that the

23 defense uses *Gendron* and then conflates other cases in which

24 there have been problematic practices with government filter

25 teams to say, "Well, hey, if it happened in *In re Baltimore*, if

1  it happened in the Sixth Circuit, *Gendron* protects against

2  that.  Let's go with that system."  Again, coming back to the

3  Court's proposal, special master solves all of those problems.

4       Your Honor --

5          THE COURT:  So if you think that, tell me a little bit

6  about what you would be looking for in the characteristics of a

7  special master.  Do you think it should be a judicial officer?

8  Do you think the person should have experience in criminal law?

9  Do you think it can be somebody who has a law degree or should

10 be somebody with a law degree?  What are you thinking?  And

11 from the Court's perspective, if I could do it myself, I will,

12 but I don't know what I'm talking about in terms of volume.

13         MR. ROBINSON:  Yes to the first two questions, Your

14 Honor.  We do believe that, if available, someone from the

15 court -- not this court but the court in general should do it.

16 Expertise in criminal law is absolutely important.  I'd say the

17 preeminent quality is neutral and detached.

18     From the Government's selfish perspective, someone with

19 the time and the ability to screen these records for privileged

20 material and get those materials to the parties.  And the

21 Government's selfish interest in that is that we are still

22 actively developing our case.  Not only with respect to

23 Defendant Youngblut but with connections to other cases,

24 frankly, across the country, Your Honor.  We cannot suggest

25 right now but do have reason to believe that communications

1  that exist will be valuable for our prosecution.

2       So, you know, as a third answer to your question, someone

3  that can get the materials to the parties in a timely fashion.

4       Beyond that, our only other asks are a robust description

5  in the logs of the materials that the special master is

6  reviewing, defined deadlines and appellate procedures that the

7  parties could use to petition this court in the case there's a

8  disagreement, and beyond that, I think we're good, Your Honor.

9  Again, we would just ask that it's someone neutral, detached,

10  experienced in criminal law, and someone with the bandwidth and

11  the time to be able to fulfill this function.

12            THE COURT:  All right.  Thank you.

13            MR. ROBINSON:  Thank you, Your Honor.

14            THE COURT:  Let's hear from the defendant.

15            MR. BARTH:  Thank you, Your Honor.  Steve Barth along

16  with Julie Stelzig on behalf of my client, Teresa Youngblut.

17       If I may, Your Honor.

18            THE COURT:  Yes.

19            MR. BARTH:  Your Honor's proposal certainly is more

20  palatable to the defense than the proposal that was submitted

21  to the Court under seal by the Government.  To that I will

22  agree.  However, we still believe steadfastly, Your Honor, that

23  the most palatable method here is that the defense gets first

24  cut at review of the pretrial detention records.  The reason

25  for that, Your Honor, is courts have recognized that the

1  defense is in the best position to determine in the first cut,

2  the first review, what is privileged, what is protected, and

3  what is not.

4      So, for instance, the Court isn't necessarily going to be

5  aware of who the defense's consulting experts are

6  necessarily --

7          THE COURT:  But I just need a name, correct?

8          MR. BARTH:  Perhaps that would suffice, Your Honor.

9  The Court is not going to be as familiar with the facts of the

10 case as defense counsel is.  And our suggested method is, I

11 would argue, a hybrid of what the Court has suggested, that we

12 initially get the first review of the documentation.

13     And as far as process is concerned, Your Honor, the

14 Government has, I think, if I heard them correctly, argued that

15 there isn't an established process.  The one in the *Gendron*

16 case, which admittedly we rely on, has worked very well.  I

17 urge the Court to review --

18         THE COURT:  Was that a search warrant, though?

19         MR. BARTH:  No.  That is a case very similar to ours.

20 *Gendron* is --

21         THE COURT:  Oh, that's the capital case.  You would

22 agree with me that the search warrant cases are distinguishable

23 because somebody's already seized it, it's a finite amount of

24 material, and it's kind of a one-off; you're going to be

25 reviewing what's been seized, sometimes it's going to be a lot

1  of material, but it's going to be a single experience and then

2  somebody's going to release it?

3           MR. BARTH:  I agree with the Court 100 percent that

4  those cases are distinguishable.  Perhaps, though, not in the

5  way the Court sees them, if I catch the Court's tone.  I would

6  argue in those cases the grand jury subpoenas, the search

7  warrant cases, the law firm cases, there is less of an acute

8  need than we have in this case for initial defense review.

9       For one thing, Your Honor, this case is distinguishable

10  from all those cases because we expect in short order

11  death-eligible offenses to be filed by the grand jury.

12  Secondly, we have a very tight time schedule that the Court is

13  not currently aware of but will be in short order to meet with

14  the capital case section in D.C.

15      So this case is moving at a rapid pace, but also it's

16  moving in a direction that makes it qualitatively different

17  than all of the cases regarding search warrants, subpoenas, and

18  law firms in which almost all of them express some concern

19  about a filter team, and certainly, as I mentioned, *Gendron*,

20  the case most factually similar to this one, really similar at

21  least as far as its procedural footing is concerned, is on all

22  fours here.  The Court ordered a specific process to be in

23  place where the defense gets first review of pretrial detention

24  material.  It has worked very well.

25      As I said a moment ago, I direct the Court to ECF 266.  In

1  that case it's notable, the Court's order.  Much of the

2  material ultimately ends up in the Government's hands.  Much of

3  it.  But when there is litigation in that case over privilege,

4  over privacy rights, over confidentiality, there have been

5  times, several, where the Court has ruled that certain things

6  are privileged, protected, and that they should not be turned

7  over to the Government.

8      Your Honor, we believe that there's at least four

9  categories of protected materials.

10     One is, of course, attorney-client privileged

11  communications.

12     The second, Your Honor, is attorney work product.  I would

13  argue to the Court that the defense team is in the best

14  position, in particular as it relates to attorney work product,

15  to identify things that might go into attorney strategy and

16  attorney opinion.  Okay?  And those -- as I mentioned earlier,

17  attorney work product doctrine could be as simple as, you know,

18  a consulting expert going to a facility, a particular expert's

19  name, the duration of their stay, *et cetera*.

20     The third category, of course, is mental health.  The

21  Supreme Court, as we briefed, has recognized

22  psychotherapy-patient privilege, and here, of course, there's

23  going to be mental health screening, *et cetera*.  That's

24  happening at each facility.

25     And finally, Your Honor, we believe that the Health

1  Insurance Portability and Accountability Act would prevent the

2  Government from viewing any of the health care records.  We

3  believe that facilities such as the ones our client is likely

4  to be in are covered entities, but even if they're not, I can

5  tell you that most of these facilities that are dealing with

6  injuries or medical issues as severe as the ones my client

7  suffered and is getting treatment for are handled by

8  third-party care providers.

9      So recently we requested documentation from the facility

10 my client was -- was residing at at the time, and we were

11 required to submit a HIPAA release form, and we got documents

12 in return, and on the cover page of those documents was the

13 following notice to recipient, from us, from a third-party care

14 provider.  It read:  "Enclosed materials include information

15 protected by federal and state privacy rights, including those

16 created pursuant to the Health Insurance Portability and

17 Accountability Act," also known as HIPAA.

18     So, Your Honor, there's going to be a wide range, in our

19 view, of protected materials, whether because of privilege,

20 whether because of statute, or because of the attorney work

21 product doctrine.  And again, we feel that we are in the best

22 position to determine - again, this would be the initial

23 review - what is protected and what isn't.

24     In the *Gendron* case, robust privilege logs were created,

25 submitted to the Government.  There was litigation, and

1  ultimately the Court determined what was privileged, what was

2  protected, and what wasn't.  And I would add, Your Honor, in

3  this case the Government does seem to be asking for medical

4  records.  In the *Gendron* case, the Government conceded it would

5  not be asking for medical records.  I don't know what its

6  thought process was there, but I have to assume that it

7  considered medical records to be protected, as we've argued in

8  our pleadings and now before the Court today.

9      Your Honor, if I may, I want to consult with my colleague

10 and my client.

11         THE COURT:  Sure.  I have a couple questions to ask

12 you.

13         MR. BARTH:  I knew.

14         THE COURT:  I have not seen any of the circuits

15 endorse defense-initiated filter team, and are you aware of any

16 circuit that has approved that process?

17         MR. BARTH:  So, Your Honor, I am not, but I would

18 point to *In re Grand Jury Subpoenas* – that's 454 F.3d 511 -

19 cited in our papers.  That is a Sixth Circuit case from 2006.

20 Notably, in that case, yes, the Sixth Circuit endorsed a

21 special master, as the Court has suggested here, but as I read

22 the opinion in *In re Grand Jury Subpoenas*, after that first

23 review, the documents then went to the defense for review.  So

24 in a way --

25         THE COURT:  Well, of course.  So, I mean, I think that

1 would happen.  If I think something is attorney-client

2 privileged, the last thing I'm going to do is give it to the

3 Government first.

4 　　　　MR. BARTH:  Well, certainly.  Of course.  I understand

5 that.  What we -- if the Court is inclined, we would ask that

6 after the documents are submitted for review by the special

7 master, that we receive all of them.  We have seen time and

8 time again, recognized both by district courts and circuit

9 courts, that for whatever reason, trained attorneys have

10 failed, probably for the most part out of negligence or

11 ignorance about the case or just haven't thought as a defense

12 attorney in that -- in that view.  We have seen over and over

13 again experienced attorneys, filter teams, miss it.  They miss

14 it.  And it isn't until litigation happens that the Court then,

15 perhaps for the first time, realizes, oh, yes, this is

16 privileged material.

17 　　　　So I would be very hesitant to endorse a special master

18 that would only turn over to us close documentation; that is,

19 materials that are on the borderline of privilege or protected,

20 and turning over everything else to either the Government or

21 both parties at the same time.  The reason for that, Your

22 Honor, is the -- the possibility for a violation of

23 confidentiality, privilege, or the Constitution is great, and

24 once the horse has left the barn, there's really going to be a

25 difficult time or really impossible getting back in.

1    I would point to the *Pedersen* case out of the District of
2  Oregon.  In that case there was a series of both discovery and
3  in particular filter team violations.  That case, as I recall,
4  was authorized as a capital case, to seek the death penalty.
5  After these filter team violations came to light, it was
6  deauthorized.  Nonetheless, the Court, even after the
7  defendants had entered a plea, sought -- felt it was necessary
8  to publish an opinion describing the shortcomings of the filter
9  team, and in it - I raise this for the following point - it
10 notes that the Government isn't really cognizant of how close
11 they came to not just jeopardizing capital punishment but the
12 entire case itself.  Those are the Court's words, not mine.
13    And so this idea that a special master would turn over to
14 us first the close calls, that gives us some comfort but not
15 total comfort, and I would think the Government and the Court
16 would feel more comfortable about not jeopardizing, to use the
17 words of the judge in the District of Oregon, their prosecution
18 by letting us have first -- first review.  So --
19         THE COURT:  So let me ask you about how is it possible
20 that your attorney work product would end up in materials that
21 the Government is subpoenaing unless it's coming by a recorded
22 jail call or they're subpoenaing somebody's e-mail records at a
23 facility?  How would they ever be getting your work product by
24 the normal investigative means that government prosecutors use?
25         MR. BARTH:  Well, perhaps that's a two-part question.

1  The first is how would they get it.  Are we talking about in

2  the case of a special master, Your Honor?

3          THE COURT:  No.  I'm just saying you're saying that,

4  you know, "They're going to be seeing my work product," and I'm

5  like, how?  I mean, jail calls I can see.  They already say

6  they're not going to be opening attorney mail.  How are they

7  going to get your work product through normal investigative

8  means?  I'm not finding that except in the narrow category of

9  jail calls.

10         MR. BARTH:  Well, let me give you one example.

11 Attorney work product can be found certainly within

12 communications between attorney and client.  The Court has

13 noted one:  phone calls.  But another, Your Honor, may be

14 written correspondence with -- between client and attorney.

15 That's one way.

16     The Court notes that the Government isn't going to be

17 asking for attorney-client communications, written or

18 otherwise, but what does that mean?  Essentially they're going

19 to be asking a local jail, a county jail, perhaps a state

20 prison, to essentially act as the initial filter team, okay?

21         THE COURT:  Which they do all the time.  So all of

22 these facilities have protocols about attorney mail.

23         MR. BARTH:  They do.  And what we know is they

24 routinely fail.  We know that from the *Gendron* case.  In fact,

25 in ECF 266, the Court noted that it ordered the local

1  facilities in that case not to turn over attorney-client calls

2  or any correspondence between attorney and client.  Thankfully

3  in that case the Court had ordered the first review to go to

4  the defense, even upon request by the Government.  What

5  happened was the jails, in violation of the Court's order, sent

6  attorney-client calls to the defense.

7           THE COURT:  Not to the defense.  The prosecutors.

8           MR. BARTH:  No.  To the defense.

9           THE COURT:  Okay.

10          MR. BARTH:  Because thankfully in that case Judge

11 Vilardo had already ordered that the defense gets first review.

12          THE COURT:  Okay.

13          MR. BARTH:  But had previously ordered, "Don't send --

14 you know, we don't need to have the defense reviewing its own

15 phone calls, its own correspondences."

16          THE COURT:  All right.  Now I'm following you.  Thank

17 you.

18          MR. BARTH:  And so -- and that is not the only

19 example.  It's the one I have at the -- sort of the forefront

20 of my mind because it's so close in kind to the present case,

21 but there have been other violations of a similar nature where

22 you're asking a local jail -- which may or may not have

23 protocols.  We know, for instance, that right now facilities

24 across the country and including in this state are down

25 manpower.  They don't have the same manpower they had

1  prepandemic for a variety of reasons, most of which is not
2  their own fault, but it's a fact.  And so these kinds of
3  violations happened even before that, and now we're expecting
4  correctional officers to work as attorneys and determine what
5  may or may not be privileged and take the time to review.  Even
6  if they do understand privileges, do they have the time to
7  review it?
8      So, yes, I agree these protocols are in place in most
9  facilities, although I wonder how robust they are in each.  We
10 haven't heard -- we haven't heard anything from the Government
11 in that regard.  But they're not foolproof, and in fact, we
12 know for a fact that they have failed in the past.
13     So again, Your Honor, it is our position that the defense
14 is in the best position -- because of its familiarity with the
15 case, because of its viewpoint as defenders of privilege, as
16 defenders of their client, that we're in the best position to
17 take first review; then, in keeping with the Government's
18 request, put together a robust and descriptive privilege log
19 that would go to the Government.  And if we can't work it out
20 on our own, then we go to the special master or Your Honor,
21 which is how we envisioned this in the first place, and on a
22 fairly tight time frame per the Government's request.  I'll
23 note that the time frame in our proposal is shorter and
24 certainly we think more practical than that in the Government's
25 proposal.

1          THE COURT:  All right.  You wanted to consult with

2  your colleague?

3          MR. BARTH:  I do.  If I may.

4          THE COURT:  You may.

5          MR. BARTH:  Thank you for the indulgence, Your Honor.

6  My colleague wanted me to point out, and I think this is a

7  point I've already made, and hopefully I articulate it better

8  this time; that is, if the Court is inclined to appoint a

9  special master or if the Court is inclined to act as the first

10  review, so to speak, again, after that review is complete, we

11  would ask that all material go to the defense for review so

12  that we can weigh in on the four categories of privilege or

13  protected materials that we've identified in our papers.

14      Unless the Court has any further questions, Your Honor, I

15  would -- I would submit at this point.

16          THE COURT:  All right.  Thank you.

17          MR. BARTH:  Thank you, Your Honor.

18          THE COURT:  I'm going to deny both motions.  I am

19  going to be the reviewer.  I will remain flexible.  If I -- if

20  it's too much, I want the option of a special master.

21      I have thought a little bit about how this should unfold.

22  You've thought a lot about it.  I don't have a difficulty

23  taking directions from an attorney.  I do what I'm told.  So I

24  think that this is something that now you know who's going to

25  do it, how it's going to be.  I don't mind you imposing

1  deadlines:  "Five business days you have to do it."  I assume

2  there's going to be some push about where the materials go

3  afterwards.  I will resolve any conflicts you have.  I often

4  say I have a 100 percent dissatisfaction rate with whatever I

5  come up with, but if you cannot agree that they go to the

6  defense first or they go to the prosecution first, I will

7  resolve your conflicts.

8      In terms of when you provide me with names that you want

9  me to look at, you're going to have your own timeline as to how

10 that's going to happen.  I can't imagine that there's going to

11 be somebody better suited to know the facts of the case and

12 who's who, and if it turns out that there needs to be a special

13 master, I invite you to come up with what you think the

14 qualifications are:  well versed in criminal law or it doesn't

15 matter; somebody who has the adequate time; do I get a recall

16 magistrate judge to help out; should it be a permanent law

17 clerk that knows a lot about criminal law?  Think about what

18 you want.  I'll be receptive to that, but I will be the first

19 person to take a look at that.

20     We'll stay in touch about this, whether this is working

21 out, and we'll tweak it as we go along.  I imagine we're going

22 to find that there's stumbling blocks along the way, but if we

23 work as a team, we're going to be able to get this done.  It's

24 a priority for me, so you don't have to worry, and as the

25 people from Vermont know, I'm typically quite timely with my

1 work.

2       So if I give it to you to work out in, say, the next 14

3 days, do you think that will work?  Would you prefer to have

4 that first cut, or would you like me to do it?  I really

5 recommend that if you can work together, that's probably the

6 best way to get what you want.

7              MR. ROBINSON:  I don't intend to talk across the bar.

8 The question was directed at both of us, and I just wanted to

9 make sure I was speaking to the Court.

10      If I can clarify your proposal, are you asking for the

11 defense and the Government to work together and submit a plan

12 to you within 14 days?

13             THE COURT:  Yes.  A protocol for my review.

14             MR. ROBINSON:  Yes, Your Honor.

15             THE COURT:  How it's going to happen, what are the

16 deadlines, how are you going to get me the material, *et cetera*.

17             MR. ROBINSON:  The Government would happily oblige.

18             THE COURT:  All right.  Mr. Barth, does that work for

19 your team?

20             MR. BARTH:  Yes, Your Honor.  I agree.  The parties

21 will meet and confer and try to get something to the Court in

22 the next 14 days or otherwise advise the Court where we are

23 with our discussions.

24             THE COURT:  Okay.  All right.  Anything else that we

25 need to take up today?

1          MR. ROBINSON:  Nothing from the United States, Your

2  Honor.  Thank you.

3          MR. BARTH:  Not from the defense, Your Honor.  Thank

4  you.

5          THE COURT:  Thank you.

6      (Court was in recess at 1:41 PM.)

7

8

9              C E R T I F I C A T I O N

10     I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12

13

14  June 25, 2025                   Johanna Masse  Digitally signed by Johanna Masse
                                                   Date: 2025.06.25 16:50:05 -04'00'

15                                  Johanna Massé, RMR, CRR

16

17

18

19

20

21

22

23

24

25